Joseph Modugno, J.
These are claims for personal injuries arising from an incident which took place at Creedmoor State Hospital on September 23, 1972.
Both claims were consolidated for trial since they had their origins in the same occurrence.
By stipulation the trial was limited to the issue of liability.
On September 23, 1972 William J. Heegan and Joseph T. Ward, who were employed by the City of New York as uniformed patrolmen, were performing a 1:00 a.m. to 8:00 a.m. tour of duty in a radio motor patrol car in sector A of the 111th Precinct, Queens, New York. At 5:15 a.m. the officers received the following radio transmission: "Building #51, Creedmoor Hospital, man with a gun.” After receiving that transmission they proceeded to building No. 51. Upon arrival they were informed by members of the Creedmoor security patrol that there was a man in the building with a "real gun”. Both officers entered with their service revolvers drawn and proceeded to the lounge on the ground floor. As they entered the lounge, the officers observed a group of approximately five males and three females. Patrolman Ward subsequently bolstered his gun when he was assured by one of the women, a Miss Regina Bailey, that he would not need it. At that point a man stepped from behind Miss Bailey and aimed a handgun *585 at Patrolman Ward. The officer pinned the assailant’s gun hand with his right hand, but was unable to stop him from firing his weapon. He fired six times, hitting Patrolman Ward twice in the left shoulder and once in the right thigh and hitting Patrolman Heegan in the scrotum and left thigh. Patrolman Heegan returned fire, firing three times, hitting the assailant twice in the right side and once in the cheek. The perpetrator was eventually subdued and later identified as Meredith Gilbert. He was charged with two counts of attempted murder, two counts of assault first degree, two counts of reckless endangerment and possession of a deadly weapon. This weapon was later identified as a .32 caliber Smith & Wesson revolver.
It appears that the assailant, while not an employee of Creedmoor, was attending a "swim and soul breakfast” party for Creedmoor employees who had successfully received their high school equivalency diplomas from Hofstra University. Although Gilbert was not a Creedmoor employee, he had participated in the inauguration of the high school equivalency program at the hospital and his wife, Fanny G. Gilbert, was the organizer of said party.
On the date of this grievous assault, Mrs. Gilbert was employed on a part-time basis at Creedmoor as an assistant to the Chief of Nursing Services and Training. At the same time she was employed by Hofstra University in conjunction with its high school equivalency program. In fact, Mrs. Gilbert was in charge of that program at Creedmoor where mental hygiene assistant aides had enrolled for the purpose of upgrading their educational background. The Hofstra program was part of Creedmoor’s education services program for employees.
Plans for the party were initiated in early July, 1972 and in August permission to use the lounge in building No. 51 was obtained from Miss Patty Goodman, the Chief of Education and Training. Permission to use the kitchen and pool facilities was also obtained from Mrs. Eileen Schmidt, the Chief of Rehabilitation. The party was intended to run from 12 midnight to 4 a.m. on September 23, 1972. It was scheduled at that time so that people working the 4 p.m. to midnight shift on September 22 could attend.
While the party was interracial, approximately 90% of those in attendance were Black. That percentage reflected the number of Blacks enrolled in the equivalency program. Since the majority of the people in the program were Black, the *586 theme of the party was "Black America”. In accordance with that theme, posters of Black leaders were placed on the walls of the lounge in building No. 51. In all, approximately 45 people attended the party.
At approximately 4:10 a.m. the assailant, Meredith Gilbert, became rowdy, threatened his wife and several other people with a handgun. No action was immediately taken. However when the assailant persisted in his threats, the security patrol at Creedmoor called the 111th Precinct for assistance. It should be noted that members of Creedmoor’s security force do not carry handguns. As related above, when Patrolmen Heegan and Ward entered the lounge they were shot by Mr. Gilbert.
The patrolmen have instituted their suits against the State, claiming that the State was negligent in allowing said party to occur; in failing to properly supervise and control it; in failing to search and inspect the persons entering said party; in failing to remove Mr. Gilbert from the premises, and in allowing racist and anti-police posters to be displayed on its premises.
The claimants also allege that the State should have foreseen the occurrence of this shooting incident.
This court cannot agree. One of the prerequisites of liability based on negligence is that the risk of injury or damage must have been reasonably foreseeable. Foreseeability of the risk of injury or damage is the quintessential and indispensable requisite of negligence, the conditio sine qua non. In other words, negligence is gauged by the ability to anticipate; the risk must lie within the range of apprehension. It is where in the exercise of ordinary care, injury is unforeseeable, or is the result of an act of God, that the negligent wrongdoer is exculpated. (Le Roux v State of New York, 307 NY 397; Payne v City of New York, 277 NY 393; Heeney v Topping, 18 AD2d 618, affd 13 NY2d 1049; Sauer v Hebrew Inst. of Long Is., 17 AD2d 245, affd 13 NY2d 913; Flynn v City of New York, 13 AD2d 237, affd 10 NY2d 930; Nucci v Warshaw Constr. Corp., 13 AD2d 699, affd 12 NY2d 16; Bolsenbroek v Tully & Di Napoli, 12 AD2d 376, affd 10 NY2d 960; Popkin v Jewish Young Men’s & Women’s Assn., 282 AD2d 824, affd 306 NY 704; Shaw v Irving Trust Co., 249 App Div 659, affd 274 NY 632; Simpson v Fiero, 237 App Div 62, affd 262 NY 461; Johnston v Blanchard, 276 App Div 839, affd 301 NY 599; Palsgraf v Long Is. R. R. Co., 248 NY 339; McGlone v Angus, *587 Inc. 248 NY 197; Schubart v Hotel Astor, 168 Misc 431, affd 255 App Div 1012, affd 281 NY 597; Klein v Hoffman, 15 AD2d 899, affd 12 NY2d 850; Brown v American Mfg. Co., 209 App Div 621; Daly v State of New York, 226 App Div 154; Daly v Horton Ice Cream Co., 166 App Div 28; McDonald v Central School Dist. No. 3, 179 Misc 333, affd 264 App Div 943, affd 289 NY 800; Rucker v Andress, 38 AD2d 684; Vincent v Dickinson, 36 AD2d 570; and Tirado v Lubarsky, 49 Misc 2d 543, affd 52 Misc 2d 527.)
Not every possible accident due to unusual and reasonably foreseeable combinations of circumstances is included in the concept of actionable negligence; reasonable foresight is required, but not prophetic vision. The test of actionable negligence is not what could have been done to have prevented a particular accident, but what a reasonably prudent and careful person would have done under the circumstances in the discharge of his duty to the injured party. Failure to guard against a remote possibility of accident, or one which could not, in the exercise of ordinary care, be foreseen, does not constitute negligence. Negligence does not exist unless there is a reasonable likelihood of danger as the result of the act complained of. (Cartee v Saks Fifth Ave., 277 App Div 606, affd 303 NY 832; Collins v Noss, 258 App Div 101, affd 283 NY 595; Payne v City of New York, supra; McKinney v New York Consol. R. R. Co., 230 NY 194; Polemenakos v Cohn, 234 App Div 563, affd 260 NY 524; O’Neill v City of Port Jervis, 253 NY 423; Dressler v Merkel, Inc., 247 App Div 300, affd 272 NY 574; Stanton v State of New York, 26 NY2d 990; Morris v Troy Sav. Bank, 32 AD2d 237, affd 28 NY2d 619; and Brutman v Lane’s Dept. Store, 28 AD2d 690.)
On the other hand, negligence may be established although the defendant did not have notice of the particular manner in which an accident would occur, so long as it was reasonably foreseeable by an ordinarily prudent person. As a general proposition, liability for negligence turns upon the foreseeability of the exact nature and extent of the injury which does in fact ensue. But liability has been denied where it could not fairly be said that the defendant should have anticipated the peculiar and unique circumstances of claimants’ injuries, caused by his self-projection into an area which a reasonably prudent man would not see as a place of peril in the course of usual activities. (Rivera v City of New York, 10 AD2d 72; Boerio v Haiss Motor Trucking Co., 7 AD2d 228; Abbott v New *588 York Public Library, 263 App Div 314; Slavin v State of New York, 249 App Div 72; Poplar v Bourjois, Inc., 298 NY 62; and Italiano v Jeffrey Garden Apts. Section II, Inc., 3 AD2d 677, affd 3 NY2d 977.)
Furthermore, the rule is well established that for a negligent act to be regarded as the proximate cause of an injury to another, the injury must be one which could reasonably be foreseen. In other words, the proximate cause must be one which in view of all the surrounding circumstances might readily have been foreseen by an ordinarily prudent man as likely to result in the injury. (Payne v City of New York, supra; Wildman v Board of Educ., City of N. Y., 254 App Div 591, app dsmd to app den 279 NY 706; Shaw v Irving Trust Co., supra; Gattner v Coliseum Exhibition Corp., 17 AD2d 44, affd 12 NY2d 933; Rosen v Bronx Hosp., 308 NY 925; Cartee v Saks Fifth Ave., supra; Flynn v City of New York, supra; Nilsen v Long Is. R. R. Co., 268 App Div 782, affd 295 NY 721; Bolsenbroek v Tully & DiNapoli, supra; Ehrich v Guaranty Trust Co., 194 App Div 658, affd 233 NY 637; Perry v Rochester Lime Co., 219 NY 60; Hall v New York Tel. Co., 214 NY 49; Odell v Solomon, 99 NY 635; Donovan v Bender, 9 NY2d 854, affg 11 AD2d 735.)
Finally the injuries sustained must be the natural and probable consequence of the act or acts claimed to be negligent.
Thus a person is not ordinarily chargeable with damages because he failed to anticipate a third person might commit a crime.
Accordingly, under the circumstances in this case this court does not feel that the State could have reasonably foreseen the occurrence of this incident. Since it was not foreseeable on the State’s part, the State’s actions or lack of action cannot be held as the proximate cause of the incident.
To hold the State responsible for the officers’ injuries would be tantamount to saying that a person holding a party on his premises will be responsible for any action taken by his guests regardless of whether he could have foreseen said action and prevented it. Additionally, a logical corollary thereof would be the reluctance and unwillingness of persons to call for police assistance in their homes, businesses, hospital, restaurants or public places of entertainment for fear of leaving themselves open to lawsuits by members of the Police Department injured in the performance of their duties. Clearly that would be a *589 harsh, unconscionable ruling and contrary to the public interest.
Policemen entering private premises are neither licensees nor invitees, but instead constitute a special class sui generis, privileged to enter the land for a public purpose irrespective of consent. Whether they have been summoned by the owner or enter of their own volition, the duties owed them do not vary. The duties are twofold. First, the owner is obliged to use reasonable care to keep in safe condition those parts of the premises which are utilized as the ordinary means of access for all persons entering thereon. Second, if the owner knows of the presence on the premises of officially privileged persons, such as policemen, and is cognizant of a dangerous condition thereon and has a reason to believe that they are unaware of the danger, he has a duty to warn them of the condition and the risk involved. (See Beedenbender v Midtown Props., 4 AD2d 276.)
Clearly the first duty is inapplicable in this case. However, the second duty was met by the State. The officers were warned by Creedmoor’s security force that there was a man present in building No. 51 with a gun. From that point on the officers proceeded at their own risk in the normal performance of their required duties. When Patrolman Ward, relying on the statement of Regina Bailey that he would not need his gun, unjudiciously bolstered it, he did so sub suo periculo.
Further, this court does not hold that the State had the duty of searching the people attending the party at building No. 51. Of course if the State had advance warning that someone attending the party would be carrying a gun, then a duty to search might have existed. Yet, no evidence was elicited which would have alerted the State to such a situation.
Unquestionably a landowner has the affirmative duty of protecting those legally on his premises from the negligent and criminal acts of third persons. A corollary of that duty requires a landowner to expel those who pose a threat to the safety of those legally on his premises. This court agrees fully with the cases cited by the claimant, Ward, as demonstrative of those legal principles. Yet the cases dealing with the landowner’s duty of expulsion are distinguishable. In those cases the landowners failed to expel people they knew posed a threat to others lawfully present. Here the State, when confronted with a threatening individual, took the proper steps to *590 expel him by calling the police. Creedmoor’s security force was not equipped to subdue the individual and it followed the proper procedure by calling the police officers, who were better equipped and trained to handle such a situation. While the Police Department was not immediately called at 4 a.m., when Mr. Gilbert first threatened people at the party, the court does not feel that the time delay in any way constituted negligence on the part of the State, or that the delay caused the resulting shootout. In summary, the State met its duty of expulsion when it called the police.
The claimants have also pointed to certain posters on the walls of the lounge of building No. 51, saying they incited the assailant causing him to shoot the police officers. This court finds no basis to the allegation that said posters incited the assailant thereby causing him to shoot the officers. While there were several posters at the party, including pictures of Bobby Seale, Eldridge Cleaver, Huey Newton and Martin Luther King, only one of those posters contained racist and disparaging statements of police, specifically the words "Kill Pigs” in letters only two inches in height. The assailant was obviously in a threatening and agitated state prior to the arrival of the officers. His agitation had been precipitated by an argument with his wife and if any reason can be attributed to his shooting the officer, it was that argument. The testimony shows that after the party, Mrs. Gilbert sought the assistance of Mr. Fountain, the building custodian, to clean up. When she returned after 20 minutes, Mr. Gilbert, in a moment of jealous anger, pulled out a revolver and while pointing it at his wife, inquired where she had been with Mr. Fountain. When assured by Mr. Fountain that they were merely cleaning up and nothing else had occurred, Mr. Gilbert put away his gun. Mrs. Gilbert further testified that she didn’t know that her husband carried a gun or, indeed, that he even owned a gun.
Undeniably, Creedmoor’s administration could have called for the removal of the racist posters; however, its failure to do so was not a contributing factor to this tragic incident.
As to the allegation that alcohol was being served in violation of the hospital rules, there was no competent probative evidence that this was an "alcoholic party”. Even if the court were to stretch the rules of evidence and allow "hearsay statements” to the effect that the punch bowl had been "spiked” with liquor (an assumption which does not strain *591 human credulity), the uncontroverted testimony is that Mr. Gilbert was not intoxicated. His wife testified that he did not appear drunk nor that there was any trace of alcohol on his breath. The court believes, therefore, and so finds, that alcohol was in no way a causative or a contributing factor in the chain of events that culminated in the shooting of the two policemen.
In conclusion each of the alleged acts or alleged omissions of the State, which the claimants contend resulted in this incident, whether looked at individually or collectively, could not have been foreseen and cannot be said to be the proximate cause of the shooting of the police officers. The risk of being shot is unfortunately part of a policeman’s job which in this age of violence and terror is more prevalent than ever, and results in so many tragic deaths.
The court is sympathetic to the plight of these two fine police officers who sustained serious injuries in the performance of their official duties. Sympathy and a deep sense of human compassion would dictate the rendering of a decision in their favor; but long-established and sound legal principles strongly militate against it. Judex debit judicare secundum allegata et probata. Therefore, the court is reluctantly constrained to grant the State’s motion made at the close of the evidence. Both claims are hereby dismissed.